106 NEW-YORK PRACTICE REPORTS.

The People agt. The Long Island Railroad Company.

## SUPREME COURT.

The People agt. THE LONG ISLAND RAILROAD COMPANY.—
Six indictments for alleged public nuisance.

The People agt. THE BROOKLYN AND JAMAICA RAILROAD
COMPANY.—Three indictments for the same offence.

The defendants in these cases, two railroad companies, were indicted for a *public nuisance* in running their engines and cars through Atlantic street, and through a tunnel in Atlantic street, in the city of Brooklyn, New-York.

The defendants moved to change the *place of trial* from the county of Kings, on the ground that there was a strong and controlling excitement against the defendants upon the principal question involved in these controversies in the city of Brooklyn, caused principally by those who had been instrumental in procuring the indictments;

*Held*, that if the objection to the jurors extended no further than to the residents of Brooklyn, and if it prevailed generally as to them, but not to those residing in the other towns in the county, it was enough to call upon the court to change the place of trial. Because, comparatively the number of jurors from the other towns in the county must be very small, the population of Brooklyn being 205,250, while that of the other towns was 11,105.

*Held*, also, that the several facts stated to show that there was a strong excitement and a hostile feeling against the defendants, in reference to the charges of nuisance contained in the indictments, prevailing extensively, not only among the residents along Atlantic street, but extending through the entire city, was sufficient to authorize the court to order the place of trial to be changed. It was accordingly changed to the county of Westchester.

*Brooklyn General Term*, 1858.

J. M. VAN COTT, *for the people*.
JOHN DIKEMAN *and* J. GREENWOOD, *for L. I. R. R. Co.*
S. C. LYON, *for Brooklyn and Jamaica R. R. Co.*

By the court—S. B. STRONG, Justice. The defendants have moved that the place of trial in these actions should be changed, on the ground that a fair and impartial trial cannot

NEW-YORK PRACTICE REPORTS. 107

The People agt. The Long Island Railroad Company.

be had in the county of Kings, where the indictments were found, and the facts upon which they are based occurred. There are reasons for which I would gladly have abstained from expressing an opinion upon the motion, but they are not such as to legally disqualify or exonerate me from participating in the decision, and as my views differ to some extent from those expressed by one of my brethren, I conceive that I am bound to state them.

It is of course, desirable that trials in criminal cases should be had where the offences are alleged to have been perpetrated. Witnesses for the prosecution often attend reluctantly, and generally without compensation, and if they should be called upon to travel far from their homes, they would be subjected to great hardship, or would abstain from attending, to the great obstruction of public justice. I do not, however, urge that the vicinage, as it is called, is the best adapted for a fair and impartial trial. There is often some personal feeling or local prejudice, which sadly interferes with the due and impartial administration of justice, and sometimes induces strange verdicts, or what is becoming a serious evil, final disagreements among the jurors. But for the trouble, delay and expense, caused by trials at distant or remote places, it would be well that they should take place before jurors to whom the parties, their interests and their feelings are unknown. It might sometimes subserve the ends of justice that the parties and their witnesses are personally known to the jurors, but the advantage is more than balanced by the undue influence of personal or local considerations, which is often imperceptible to him whom it controls.

A party who moves to change the place of trial from where the law primarily establishes it, must fail unless he satisfies the court that the ends of justice require, or at all events will be promoted by it. That a fair and impartial trial by any means within the reach of the law cannot be had in the county where the venue is laid, is undoubtedly a sufficient reason for the change. The people, all men, whatever may be their character or standing, have when litigating, a right to a trial by an

unprejudiced jury. Many unbiassed and competent jurors can be found in any county of this state in any conceivable case, but the question in these applications is, whether such can be procured by the methods provided by law? Ordinarily there are no means of selection. The requisite number is drawn from the county box, and the persons named on the ballots must be summoned whether competent and unbiassed or otherwise. Even when select jurors are ordered, the county clerk names forty-eight, and neither party has any voice in the matter except to strike out twelve of the number. Where there is a widely extended bias, its application to individuals cannot be well known until they are interrogated, and therefore these methods of obtaining impartial jurors are very imperfect.

Still the court should not lightly adopt or act upon the opinion that a fair and impartial trial cannot be had in the county where the events which gave rise to the complaint are alleged to have happened. Facts, and not the mere impressions and conclusions of the parties or their witnesses, should be considered and should control. Parties generally, and their friends frequently, imbibe strong opinions from inconsiderable causes, and it is unsafe to place much reliance upon them. But there cannot well be any serious misapprehension as to the existence of facts, especially when they are of a public nature. The principal question is as to the inferences to be drawn from them.

It was said in *Messinger* agt. *Holmes*, (12 *Wend.* 203,) that the place of trial should not be changed by reason of popular excitement or prejudice, until after an ineffectual trial in the county where the venue had been originally laid. But in a subsequent case, (*The People* agt. *Webb*, 1 *Hill*, 179,) it was decided that the venue might be changed in a criminal case where the evidence of public excitement against the applicant was strong, although there had been no actual experiment made by way of trying the cause, or even impannelling a jury in the county where it had been originally laid. The learned judge who gave the opinion of the court in that case, remarked, and I think correctly, "To make such an experiment essential would

NEW-YORK PRACTICE REPORTS. 109

The People agt. The Long Island Railroad Company.

seem to be quite dangerous. It is the very thing which the law seeks to avoid when it is seen that the party may, and probably will, be drawn into a trial by a jury who, under an influence of which they themselves may be hardly conscious, an influence which perhaps no human sagacity can detect, may pronounce a verdict against him, and conclude his rights forever." True, in a case where a verdict is palpably against the weight of evidence a new trial may now be granted, but the evil of even an unjust conviction cannot be easily cured. The character of an innocent man may suffer, and he may be subjected to great trouble and expense. The venue was changed in the case of *The People* agt. *Webb*, in consequence of an excitement against the prosecutor, created by publications from the office of the defendant. The case was by no means as strong as this is represented to be, although there is a considerable resemblance in the minor features. There was another decision of the late supreme court, which was not reported, by which the venue in several actions, which I (as a member of the bar) had instituted against the Long Island Railroad Company, was changed from the county of Suffolk by reason of alleged prejudices against the company, to the county of Richmond, although there had been no attempt to try either of them. The objection that there had been no trial was strenuously urged in those cases, but it was unhesitatingly overruled. In a case where there had been an actual experiment and a failure to obtain a just verdict clearly traceable to undue excitement against the unsuccessful party, that would go far to show that a trial should be had elsewhere. Even a failure to obtain any verdict is not, however, conclusive evidence, when attributable to popular excitement, that it prevails to such an extent as to require a change of the place of trial, as was decided in the case of *The People* agt. *Bodine*, (7 *Hill*, 181.) In that case, however, there was an actual necessity for the change, as subsequent attempts to try the defendant in Richmond county and in the adjoining county of New-York proved ineffectual. In the late case of *The People* agt. *Baker*, where I changed the place of trial on an indictment for murder, al-

though I referred to two unsuccessful trials in the county where the venue was laid, yet I relied much more upon the causes. and other evidence of popular excitement. I do not understand Judge .PARKER as repudiating, in the late case of *The People* agt. *Wright*, (5 *How. Pr. Rep.* 28,) the doctrine of the late supreme court in *The People* agt. *Webb*, and the later cases to which I have alluded. He says, that an actual unsuccessful experiment is not the only admissible proof to sustain the allegation of undue bias in the county where the venue is laid. He does indeed refer to the case of *The People* agt. *Webb*, as the only one cited or which he had found, in which a change of venue had been granted, on the ground of excitement without a previous attempt to impannel a jury. But he canvasses the proof in the case before him very closely, and relies upon its insufficiency to show the fact as the ground of his decision, which would have been unnecessary if the technical objection had been fatal.

The main allegation in the case under consideration, is, that there is a strong and controlling excitement against the defendants, upon the principal question involved in these controversies, in the city of Brooklyn, caused principally by those who have been instrumental in procuring the indictments. It is not averred, or so far as the papers go, even supposed, that it prevails in the rural parts of the county. According to the census of 1855, the population of the city of Brooklyn was 205,250, while that of the other towns in the county was 11,105. Comparatively the number of jurors from the rural districts must be very small. In an ordinary panel there would not probably be enough to constitute a single jury. Even if a jury could be selected from the county, there could not be more than one from the entire panel, and the other cases would have to be tried by Brooklyn jurors or go .over to another term. If, therefore, the objection to the jurors extends no further than to the residents of Brooklyn, still if it prevails generally as to them, it is enough to call upon us to change the place of trial. Several facts have been stated to show that there is a strong excitement, and a hostile feeling

The People agt. The Long Island Railroad Company

against the defendants, in reference to the charges of nuisances contained in the indictments, prevailing extensively not only among the residents along Atlantic street, but extending through the entire city. Before any action by the common council against the defendants, meetings of the inhabitants were called by hand-bills and notices posted up in many public places in the city and in the ferry-boats. In some of them there were such expressions as the following : " Odious railroad monopoly," " running the filthy manure cars," " obstructing the street with a tunnel," " tremble tyrants when you read the doctrines of our inalienable rights," " they have usurped possession of the streets without any legal right," " this locomotive nuisance," " the people cannot be silenced forever," " its locomotive rushes wildly on, destroying all before it ! the victims ! the victims !" " only thirteen Irishmen and one Dutchman have been killed by this railroad," " the widows and orphans, who can depict the result in widows and orphans ?" " the widows and orphans by this road since it crossed our street," " the railroad insists upon running the locomotives in our streets regardless of life blood ! blood ! more blood !" One of the meetings was called to consider, " why South Brooklyn should be destroyed by nuisances ?" " Why this railroad is suffered to run over, mangle and kill citizens, without conscience ?" " Why horses and vehicles are run down, crushed and destroyed in our streets, without compensation ?" It appears from one of the papers submitted to us, that at one of the meetings called by a public advertisement, to which, according to a statement in one of the affidavits, several thousand names were subscribed, and held in the large hall at the Atheneum, every seat in the hall was filled, and that the president and three of the vice-presidents were ex-mayors of the city, and there were twenty-seven other vice-presidents, among whom were many gentlemen of high standing and extensive influence ; an application was made to the common council to abate the alleged nuisance. The matter was referred to a committee, which held several meetings in a large room, which was closely crowded. The audience was disorderly, and ac-

cording to the affidavits presented by the defendants, many, and according to the affidavits in behalf of the prosecution, a few of the spectators hissed when the counsel for the defendants were addressing the committee. A report was made decidedly unfavorable to the defendants, and the common council, in accordance with the report, adopted a resolution condemning the use of Atlantic street by the defendants as a public nuisance. There was no statement of the votes of the members of the common council, among the papers presented to us, but a majority of the aldermen, representing a large part of the entire city, must have concurred in the condemnation. The report of the committee and the concurrent ordinance of the common council were extensively published in the city papers. Subsequently, complaints were made to a grand jury, composed doubtless, principally of inhabitants of the city of Brooklyn, and the same grand jury found six indictments against the Long Island Railroad Company, and three indictments against the Brooklyn and Jamaica Railroad Company. Why so many indictments were found for the same offence, for the road is actually used only by one of the companies, was not explained to us. Among the papers presented to us, is the copy of a petition signed by thirty-five persons, containing strong representations against the conduct of the defendants, which was addressed to the grand jury, and is said to have been received by them. This was all wrong, and would, if properly noticed, have gone far to vitiate the indictments. At the late state election, the candidates in Brooklyn for the two seats in the Senate, and the seven seats in the Assembly, were catechized by a committee, upon the subject of allowing the defendants to continue the alleged nuisance, and all avowed their opposition to it. These and such as these, are the facts presented to us by the defendants, in support of their motion. They are not controverted to any considerable extent by the prosecution. There is an affidavit by the district attorney, and there are several affidavits by others, many of whom have been instrumental in procuring the indictments, expressing a strong impression of those making them, that an unbiassed jury can

The People agt. The Long Island Railroad Company.

easily be obtained in the county of Kings.  There are no facts stated, and from the nature of the case it could not well be expected that any should be stated, to show that no prejudice prevails generally in the city of Brooklyn against the defend-ants, upon the question involved in this controversy.

Taking into consideration all the circumstances, it seems to me, that the defendants ought not to be tried by a jury, con-sisting as it must, if taken from the body of the county, prin-cipally of citizens of Brooklyn.  I have every confidence in the intelligence and devotion to justice of the jurors of that city.  But they may, and probably have, imbibed strong pre-judices upon a subject of great public interest, and no one is willing to be tried by jurors prejudiced against himself or his interest, however respectable and well informed they may be. That the residents on a long and populous street, extending from the South Ferry to Bedford, are warmly and actively op-posed to the defendants in this controversy, and are thus dis-qualified from acting as jurors, there can be no doubt. A feeling operating through such an extended locality is apt to prevail much further through the influence of business connections, family ties and friendly intercourse.  That it has extended it-self through a large portion of the city, is apparent from the large public meetings, the action of the common council, com-posed as it is of representatives of the whole city, and, possibly, the multiplied action of the grand jury.  I do not mean to say that in all this the citizens or the common council, or the grand jury have erred, but it does seem to me, with the greatest re-spect for all of those bodies, that the conduct of the public meetings and the people's representatives indicates a foregone conclusion against the defendants, which renders it proper that the questions to be tried in these cases, should be submitted to jurors to be selected from another community.

The district attorney objects principally on the ground that a trial in another county would subject the witnesses for the prosecution, who he says are numerous, to great inconvenience, and yet he states in his affidavit, that the cases will be decided principally, if not wholly, upon a question of law.  If he is

right in that, there cannot be any urgent necessity for the attendance of many witnesses.  We are not informed by the papers before us, nor do I know from any source, what particular questions are involved in the general charge brought against the defendants.

It is so well understood, that I think we may take judicial notice of the fact, that the inhabitants of our cities generally suppose that the use of steam in propelling locomotives through their streets is so far noxious that it is unjustifiable.  If that should be the ground of complaint, or if in addition to that, it should be contended that tunnelling a street for railway purposes was illegal, but few witnesses would be necessary.  These are the only questions of law, which so far as I understand the cases, will be probably involved on the trial.

The district attorney objects to sending the cases for trial to either of the other counties on the island, on the ground that the popular feeling there is in favor of the use of steam on the railroad in Brooklyn.  The evidence to prove the existence of such favorable feeling among the inhabitants of those counties, is inferior to that going to show the prevalence of hostile feelings in the citizens of Brooklyn, but still I am not inclined to change the place of trial to either Suffolk or Queens county. It is better that the cases should be tried where there is clearly no popular bias or prejudice which might interfere with the due administration of justice.

The court-house in the county of Westchester is not distant from Brooklyn, and with the present conveniences of travelling furnished by the railroads, there can be no great inconvenience or heavy expense incurred in taking the witnesses to White Plains.  For the reasons which I have assigned, but certainly from no distrust of the intelligence or ordinary impartiality of the jurors of the county of Kings, I am inclined to change the place of trial in the cases under consideration, into the county of Westchester.  Liberty should, however, be given to the public prosecutor and the defendants to select any other county by mutual consent.