## SUPREME COURT — SPECIAL TERM — KINGS COUNTY.

### January, 1919.

## THE PEOPLE v. TIMOTHY S. WILLIAMS, JOHN H. HALLOCK, JOHN J. DEMPSEY, WILLIAM S. MENDEN, THOMAS F. BLEWITT, EDWARD LUCIANO, alias ANTHONY LEWIS.

(106 Misc. 65.)

VENUE—WHEN MOTION TO CHANGE PLACE OF TRIAL WILL BE GRANTED—INDICTMENTS—CRIMINAL LAW—RAILROADS.

The statutory right of a defendant in a criminal action to have the place of trial changed comes to us from the common law.

Where upon a motion to change the place of trial in a criminal action the court finds from the facts and circumstances that bias and prejudice exist against the defendant his right to have the motion granted is absolute.

Where following an accident on the Brighton Beach line of the New York Consolidated Railroad Company, in which many persons were killed and many maimed or otherwise injured, the defendants, who were officers, directors, agents and employees of certain railroad corporations named, were by indictments containing appropriate allegations charged with the crime of manslaughter in the first degree, in causing the death of the persons killed, and upon motion to change the venue on the ground that a fair and impartial trial could not be had in King's county, in which the indictments were found, because of agitation by the public press and by various organizations adverse to the officials of the corporation operating the railroads in Brooklyn, it appears that, in the eyes of public opinion, the defendants were tried and convicted before the indictments against them were found, the motion will be granted as matter of right and the place of trial changed to Nassau county unless the parties otherwise agree.

MOTIN to change place of trial.

*Harry E. Lewis, District Attorney,* for plaintiff.

*Meier Steinbrink,* for Timothy S. Williams, John H. Hallock and William S. Menden.

*Stephen C. Baldwin,* for John J. Dempsey.

*Isaac R. Oeland,* for Tmomas F. Blewitt.

*Patrick E. Callahan,* for Edward Luciano, alias Anthony Lewis.

CALLAGHAN, J.:

The defendants seek to remove the trial of two actions now pending against them upon indictments found in Kings county to some county outside of the city of New York. The indictments grow out of an accident upon the Brighton Beach Line of the New York Consolidated Railroad Company, on the 1st day of November, 1918. At that time about 90 persons were killed and about 200 persons maimed and otherwise injured. The indictments are substantially the same in language. Each contains two counts. The first count in each indictment charges the defendants with the crime of manslaughter· in the first degree, in that the defendants who were officers, directors, agents and employees of certain railroad corporations, in the indictments named, were entrusted with the construction, control, supervision, administration and operation of certain lines of railroads, willfully and wrongfully committed acts and omitted to perform duties which endangered the health and safety of the passengers who had occasion to ride upon the train of said railroad and that by reason thereof the persons named in said indictments were killed. The second count of each indictment charges that, through the neglect of said defendants to discharge their duty in promulgating and enforcing reasonable rules for the employment of trainmen and motormen and for the safe operation of the lines upon said railroad, and in

employing an inexperienced, unfit, untrained and incompetent motorman who operated the train in a culpably negligent manner and at a high, excessive and dangerous rate of speed, at or near Malbone street in Kings county, the train was wrecked and the persons named in said indictments who were passengers upon said train were killed.

It is urged by the defendants that they cannot secure a fair and impartial trial in the county where the indictment was found because of agitations by the public press and by various organizations adverse to the officials of the companies operating the elevated and street surface railroads in Brooklyn.

Immediately after the accident metropolitan newspapers having a large circulation in Kings county carried long accounts of the wreck, and many of them published gruesome pictures showing the splintered condition of the cars which had been in the wreck and showing the bodies of the victims piled up near the splintered cars. There was an immediate demand from most of the newspapers for the prosecution of the officials of those roads. Some of the suggestive headlines bearing upon this accidnet were as follows: "Prosecute B. R. T. Officials, is Demand." "81 Killed, Hundreds Hurt, On B. R. T. Train, After Company Defies War Board Order; Will Charge Officials With Homicide." "Hylan Demands Prosecution of Officials of The B. R. T." "The Public Will Insist Upon Prompt And Vigorous Prosecution Of The B. R. T. Officials Whose Neglect Brought About This Shocking Disaster." "Would Hold Williams and Dempsey In Wreck." "Mayor Speeds Prosecution Of B. R. T. Officials Responsible For Wreck." "Hylan After 'Higher Ups,' Not Employees." "Prominent Men Of New York And Brooklyn Voice Indignation At Rapid Transit Officials." "Seek Officials Higher Up In Wreck Probe."

The articles following these headlines denounced the officials of these railroads for violating the orders of the war board and for their negligence in using wooden cars and for failure to

supervise properly the employment of competent and experienced motormen.

As late as December 10, 1918, one of the metropolitan papers having a very large circulation carried a cartoon which attempted to show a rather corpulent, well fed and well dressed man labeled " B. R. T.," walking over the heads of hundreds of persons, whom the cartoon describes as " passengers." This man is depicted as being in search of " dividends " which are being held in front of his eyes, and the picture is entitled " Blame It On The Motorman." This cartoon is intended, no doubt, to lead the readers to believe that the officials of these railroads were striving for dividends to the great discomfort and injury of its passengers. Another cartoon appeared in a newspaper with a large circulation showing a well dressed and prosperous looking man standing on a bridge over the entrance to a tunnel. A train is upon the tracks shown to be traveling toward the tunnel. It is marked " B. R. T." and is being driven by the hand of death. The man standing on the bridge is labeled " management " and he is directing the motorman to " Speed up, Speed up." This picture is entitled " The Reaper's Boss." The accident out of which these indictments grew occurred at the entrance to a tunnel.

Soon after the accident an organization was formed known as the " Brighton ' L.' Victims and Passengers' Protective Association." This organization held a meeting at which the officials of these rialroads were denounced and a resolution was passed and published in the newspapers reciting that " The record of the B. R. T. had been one long continuous series of abuses of the rights of the traveling public culminating in an act of gross negligence and criminal indifference which caused the most awful railroad atrocity of the annals of our city " and pledged the support of the organization to the district attorney in the performance of his duty in seeking to attach criminal responsibility to the so-called " higher officials " of this road.

" who have been more concerned about the financial policy of
the road than about the safety of its passengers." At these
meetings the officials of the railroads were severely denounced
and charged with responsibility for this accident, and one of the
speakers, herself a member of the organization, advised the
members to appear in a body in the court room where the matter
was being investigated before the mayor, sitting as a magistrate,
to bear " silent testimony of the terrible murder." At these
hearings women appeared dressed in black, sufficient in number
to fill three rows of seats on one side of the court room, and they
attended each of the hearings.

On the 3d day of November, 1918, the Central Labor Union
of Brooklyn and Queens held a meeting in this county and dis-
cussed the accident of November first. A resolution was
adopted at that meeting condemning the officials of the
" Brooklyn Rapid Transit Co." for employing an inexperienced
motorman and for their failure to " pay any attention to the
recommendation of the War Labor Board, who directed the re-
instatement of twenty-nine motormen who had been discharged
for joining a labor union, which resulted in a strike of their
fellow members," and called upon the district attorney to
" posecute the officers and directors of the Brooklyn Rapid
Transit Company for placing a person in charge of a train who
was not only inexperienced, but who had done a hard day's work
as train despatcher." This resolution with a report of the
meeting was published and widely circulated throughout King's
county.

A number of ministers in Brooklyn denounced from the
pulpit the officials of these railroads and charged them with the
responsibility for the disaster and demanded a speedy prosecu-
tion of the officials. On the day following the accident the
mayor announced that he would sit as a magistrate in what has
been referred to as a " John Doe " proceeding. During the
course of those hearings the newspapers carried a full account

of the testimony taken and continually referred to the effort which was being made to get the " men higher up."

In addition to the clippings taken from the newspapers the defendants have submitted in support of this motion a large number of affidavits from persons residing in this county to the effect that in the opinion of the affiants these defendants cannot have, by reason of the existence of bias and prejudice, a fair and impartial trial in this county. These affidavits were made by ministers of the gospel, men of other professions and business men of the community.

In opposition the district attorney has submitted affidavits from a large number of persons who had, at the request of the defendants, previously made affidavits in support of this motion. Most of these have said that they could give a fair and impartial trial to the defendants, but they do not contradict the opinion expressed in their original affidavits wherein they state that a fair and impartial trial could not be had in the county. Affidavits from most of the trial jurors called for jury service in the criminal part of this court for the November, 1918, term have also been submitted, each affiant asserting that he could sit as a juryman and impartially decide these cases.

From an investigation of the records of the various municipal courts in this borough it is further shown that in a large number of civil actions brought against the various railroad companies of the Brooklyn Rapid Transit system the defendants have demanded juries in about eighty per cent of the actions, and that recently there was tried in the Supreme Court a motorman employed by the Brooklyn Rapid Transit system and that before the trial no objection was made that a fair and impartial trial could not be had in this county. It seems to me that the demand by the railroad company for juries in civil actions is in no way indicative of the suggestion that there is a general belief that those in charge of the railroads think that a fair trial could be had on these indictments. Experience has taught me that the

reasons for demanding jury trials would not support the contention of the district attorney. And it cannot be said that the failure to object to the trying of a motorman charged with a criminal offense in this county is an indication that a jury would give these defendants a fair and impartial trial. It must be remembered that all criticisms following the catastrophe were directed at the management of these railroads and not at the motorman.

It is difficult, upon motions of this character, to secure convincing evidence that there exists in a community such a general feeling of bias and prejudice as will prevent a fair and impartial trial. This difficulty has not infrequently been recognized by our courts as in People v. McLaughlin (150 N. Y. 365) the court observed: " but its presence can usually be discovered only from circumstances and conditions which produce it." Can it be said then that, from the facts and circumstances shown upon this application, the inference can be reasonably drawn that a prejudice exists in this community which would warrant the removal of these actions? We have in support of the application the affidavits of many citizens of this community of the highest standing. The affiants are ministers of the gospel, business and professional men. They say that it is their opinion, from discussions had in their presence, that the defendants could not, by reason of prejudice and bias existing in the community, secure a fair and impartial trial. On the other hand, the people produce affidavits from most of the talesmen called to serve at the November, 1918, criminal term of this court and each says that he could fairly try the defendants and that he entertains no prejudice or bias in the matter. Many persons who made affidavits in support of this motion have at the request of the district attorney made affidavits to the effect that, although they believe the defendants would not have a fair trial in the community, nevertheless the affiants could sit as jurors and fairly and impartially render a just verdict. It must be appar-

ent, therefore, that there is a great difficulty in procuring in concrete form proof of the *actual* existence of bias and prejudice in a community.

It was the manifest purpose of the statute to provide against a trial before a jury where there is a prejudice insidious in its nature which pervades a community to such an extent that prospective jurors are unconsciously affected by its influence. It is not always easy for one to determine for himself whether he will or will not be unconsciously influenced by some agency other than the evidence produced in court. The prejudice and bias cannot always be determined by means of the questions usually asked of a proposed juror.

Precedents are of but little value. Each case must be decided upon the facts applicable to it. There are many reported cases in which applications of this character have been granted and many in which the applications have been denied. It is argued here that the decisions in the cases of People v. Sullivan, People v. Grout, and People v. Hyde furnish a precedent for denying this motion. The facts in those cases are fresh in the minds of most of people in this city. The Special Term upon each of those applications for change of venue found that there was not such a prejudice existing in the community as would prevent a fair and impartial trial. In some other recent cases, however, with which we are familiar, the Appellate Division held that a fair trial could not be had in the county where the venue was laid. Barnes v. Roosevelt (164 App. Div. 540) furnishes an example. The Appellate Division transferred the action, which was for libel, to a county other than that designated by the plaintiff, upon the ground that an impartial trial could not be had in the county where the action was brought. In Jacob v. Town of Oyster Bay (119 App. Div. 503), a change of the place of trial was ordered by the Appellate Division. That was an action brought against the town of Oyster Bay to determine title to lands. We may assume that in that case the only persons who

could be affected financially by a decision would be the people who resided in the town of Oyster Bay. That town forms a comparatively small part of Nassau county yet the appellate court said that by reason of a feeling which existed in the county where the venue was laid a fair and impartial trial could not be had. Other cases granting a change of venue are People v. Long Island Railroad Co. (4 Park. 'Cr. 602), People v. Georger (109 App. Div. 111), People v. Jackson (114 id. 697), and People v. Diamond (36 Misc. Rep. 71). The Diamond case was one where the defendant, a police captain, was charged with the crime of taking money from the proprietor of a disorderly house. In the Jackson case the defendant, a supervisor of Erie county, had been indicted for bribery and embezzlement of public money in connection with the building of an armory on the site of an old cemetery. In the Georger case the defendant was charged with the crime of larceny and perjury in wrecking a bank, of which he was the manager. In the Long Island Railroad Company case the defendant had been indicted for a nuisance in maintaining and running a railroad on Atlantic avenue in Brooklyn.

The right of a defendant to remove the place of trial has come to us from the common law and has been incorporated into our statutes. It is not the subject of judicial discretion. The question of determining the existence of bias and prejudice must be decided by the court in the same manner as any other question presented for judicial determination. If the court finds from the facts and circumstances that bias and prejudice exist the right to a removal becomes absolute, and discretion cannot be exercised. Can it be said that a jury could be selected by the method provided by statute and twelve men secured none of whom would have a prejudice against the defendants? If not, the trial should be removed. It matters not whether the defendants are innocent or guilty, our law guarantees to them a fair and impartial trial. It is important alike to the People and to

the defendants that a fair and impartial trial be had. It is of paramount importance that each be satisfied that a trial can be had free from any subtle and unconscious influence.

Removal of an action does not imply that the People cannot have a fair and impartial trial in the newly designated venue. Neither does it imply in this case that twelve men could not be found in Kings county who would give the defendants a fair and impartial trial. Such would be a serious indictment of the men of Kings county qualified to sit as trial jurors. No doubt many men could be found who would feel that they could impartially try these cases, but prospective jurors cannot be selected solely with a view of sitting upon this case. They must be drawn by the methods prescribed by statute. Neither party has a voice in the drawing of talesmen. The requisite number must be drawn at random, and the persons whose names are drawn must be summoned whether biased or incompetent. A party can eliminate a prospective juror only in the manner provided by statute, viz.: for bias or by peremptory challenge. The number of peremptory challenges is limited in the trial of an indictment of this character to twenty. Instead, therefore, of selecting a jury from a county of 2,000,000 people, as has been suggested, the selection must be made from a comparatively small panel.

Has there been engrafted onto the mind of the average man the belief that these defendants are guilty? It is difficult for me to understand how a campaign for the conviction of the defendants could have been carried on with more effectiveness than that which has been conducted in this county since the happening of the unfortunate accident. It rivals the efforts of a well organized corps of propagandists. Prejudice, insidious in its nature, was so gradually and firmly implanted into the minds of the people of the community, that it is difficult to remove it. The public press has lost no opportunity in proclaiming these defendants guilty. It has been openly and publicly charged that their

guilt was based upon their failure to obey the order of the war board, upon their failure to provide cars of steel construction and upon their failure to use proper means to determine whether or not the motorman was competent to operate a train. Ministers of the gospel have, from the pulpit, denounced the defendants and proclaimed their guilt. An organization was formed in this county from among the relatives of victims of the wreck, and a desire for vengeance has been expresesd in public meetings by the members of this organization which has, by resolution, declared that it would do everything in its power to bring about a conviction of the defendants; an organization of labor men has in effect declared the guilt of the defendants, and this latter organization has said that the catastrophe was caused through the fault of the railroad management in failing to deal fairly with their employees, thereby causing a number of experienced railroad men to quit work. The proceedings at which these sentiments were expressed have been given wide publicity; a public hearing was had by the mayor sitting as a magistrate; the newspapers have announced that it was his (the mayor's) intention of " reaching the men higher up; " the hearing conducted before him was given the widest publicity; photographs of the defendants were taken upon arraignment and published in the newspapers, and in fact the defendants were tried and convicted in the eyes of public opinion before an indictment was found against them.

I have reached the conclusion, therefore, that a fair and impartial trial of these actions cannot be had in Kings county. In arriving at that result I have not considered (as far as it is possible for one to exclude such matters from consideration) the agitation conducted in the public press with reference to a raise of railroad fares on the surface and elevated railroads in Brooklyn nor the agitation brought about by the discharge of certain of the railroad employees in September, 1918. It seems

to me that those criticisms could have no effect upon the minds of jurors called to try these actions.

I appreciate that in removing these actions due consideration should be given to the selection of a county which will not unnecessarily increase the burdens of the district attorney or the expense to the People. I have accordingly selected Nassau county as the place where I believe a fair and impartial trial can be had and a jury found which will enter into the trial of these actions free from local prejudice and bias. Mineola, the county seat of that county, is easily accessible to Brooklyn. The trains between those points run at short intervals. If the parties, however, agree upon another place for trial I will be glad to designate any county of their selection.

Ordered accordingly.